UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Michael S. Dietz,

             Plaintiff,

v.                                                    Civil No. 12-1628 (JNE/JJG)
                                                      ORDER
Irwin L. Jacobs et al.,

             Defendants.

---

Nicholas H. Callahan and Kelly W. Hoversten appeared for Plaintiff Michael S. Dietz.

Geoffrey P. Jarpe and Dawn C. Van Tassel appeared for Defendants Irwin L. Jacobs, Jacobs
Management Corporation, Jacobs Trading, LLC, John Paul DeJoria, and Operation Bass, Inc.
Courtney M. Strean appeared for Defendant Tom Grimmett.

---

Plaintiff Dietz[1] is the Chapter 7 Trustee for debtors Genmar Holdings, Inc. ("Genmar

Holdings"), Genmar Michigan, LLC, Genmar Tennessee, Inc., Triumph Boats, Inc., and Wood

Manufacturing Company, Inc., all of which filed bankruptcy petitions in the United States

Bankruptcy Court for the District of Minnesota.[2]  At the time of its filing on June 1, 2009,

Genmar Holdings was the parent company at the top of the corporate structure in which the other

debtors were subsidiaries.  In his capacity as trustee, Dietz filed adversary proceedings in the

Bankruptcy Court against the individual Defendants in this action on behalf of the bankruptcy

estates of particular debtors,[3] seeking to avoid certain alleged preferential and fraudulent

---

[1]      Charles W. Ries initially served as Trustee and his name appears on several of the
submissions related to the present motions.

[2]      The bankruptcy case number for each debtor is as follows:  Genmar Holdings, Inc. – Bky.
No. 09-43537 (DDO), Genmar Michigan, LLC – Bky. No. 09-43543 (DDO), Genmar
Tennessee, Inc. – Bky. No. 09-43544 (DDO), Triumph Boats, Inc. – Bky. No. 09-43550 (DDO),
and Wood Manufacturing Company, Inc. – Bky. No. 09-43556 (DDO).

[3]      The adversary proceedings are as follows:  Adv. No. 11-04672 (Genmar Holdings, Inc. –
Irwin L. Jacobs); Adv. No. 11-04676 (Genmar Holdings, Inc. – Jacobs Management

transfers by the debtors, as provided for by 11 U.S.C. §§ 547 and 548.  The Bankruptcy Court consolidated those adversary proceedings[4] and then transferred them, pursuant to Bankruptcy Local Rule 5011-3(a)(1), to the United States District Court for the District of Minnesota for a jury trial.

Presently before the Court are two motions seeking to exclude expert testimony: (1) a motion filed by Defendants Irwin L. Jacobs, Jacobs Management Corporation, Jacobs Trading, LLC, John Paul DeJoria Family Trust, and Operation Bass, Inc. to exclude the testimony of Harold A. Schaeffer and (2) a motion filed by Plaintiff to exclude the testimony of Arthur H. Cobb.  For the reasons stated below, the Defendants' motion is denied and the Plaintiff's motion is granted in part and denied in part.

## DISCUSSION

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), the Supreme Court confirmed that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  More specifically, Federal Rule of Evidence 702 governs the admissibility of expert testimony.  It provides that a

> witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;

---

Corporation); Adv. No. 11-04681 (Genmar Holdings, Inc. – Jacobs Trading, LLC); Adv. No. 11-04675 (Genmar Holdings, Inc. – John Paul Deloria, in his capacity as Trustee of the John Paul DeJoria Family Trust); 11-04668 (Genmar Holdings, Inc. – Tom Grimmett, in his capacity as Trustee of the JP Nevada Trust); Adv. No. 11-04715 (Genmar Holdings, Inc. – Operation Bass, Inc.); Adv. No. 11-04695 (Genmar Michigan Inc. – Operation Bass, Inc.); Adv. No. 11-4722 (Genmar Tennessee, Inc. – Operation Bass, Inc.); Adv. No. 11-04673 (Wood Manufacturing, Inc. – Operation Bass, Inc.); Adv. No. 11-4716 (Triumph Boats, Inc. – Operation Bass, Inc.).
[4]       The proceedings were consolidated under Adv. No. 11-04672.

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The factors that a district court may consider in making reliability and relevancy determinations include: "(1) whether the [expert's] theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community." *Russell v. Whirlpool Corp.*, 702 F.3d 450, 456-57 (8th Cir. 2012) (citing *Daubert*, 509 U.S. at 593-94).  But the "evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject *Daubert* factors as the particular case demands." *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005).  As long as the expert's proffered testimony appears reliable and relevant, no single requirement for admissibility exists. *Id.*

The "traditional and appropriate means of attacking shaky but admissible evidence" are "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.  The *Daubert* inquiry should therefore focus on "principles and methodology" rather than on the "conclusions that they generate." *Daubert*, 509 U.S. at 595.  Similarly, the factual basis of an expert's opinion generally "goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. Isp Techs.*, 259 F.3d 924, 929-30 (8th Cir. 2001) (internal quotation marks omitted).

With these principles in mind, the Court turns to each of the two motions.

**1.   Moving Defendants' Motion to Exclude Harold A. Schaeffer**

Harold A. Schaeffer has over 40 years of experience in the credit and banking field and is president of D & H Credit Services Inc.  Docket No. 15-2 at 7.[5]  Defendants' motion relates to two expert rebuttal reports, both dated November 26, 2012, that Mr. Schaeffer submitted in connection with the adversary proceedings against Defendants.  One report concerns Defendant Jacobs Management Corporation ("JMC") and the other relates to Defendant Operation Bass, Inc.[6]  Docket Nos. 15-2, 15-3.  The Defendants do not challenge Mr. Schaeffer's qualifications, but contend that his proposed testimony should be excluded for lack of reliability.

A.   Overview of Mr. Schaeffer's Proposed Testimony

Defendants' motion focuses on Mr. Schaeffer's opinions related to certain defenses under 11 U.S.C. § 547(c) to the Trustee's claims seeking to avoid preferential transfers.  Under 11 U.S.C. § 547(b), a trustee may "avoid" certain preferential transfers made by a debtor in the time leading up to the debtor's bankruptcy filing and when "a preferential transfer is avoided, the transferee generally must disgorge the amount of the transfer and return it to the debtor's estate." *Gulfcoast Workstation Corp. v. Peltz (In re Bridge Info. Sys.)*, 447 F.3d 1076, 1079 (8th Cir. 2006).  Certain transfers, however, may not be avoided by the trustee.  For example, the provisions of § 547(c)(1) and (c)(4) protect from avoidance transfers made in connection with "new value" to the debtor that meet certain conditions.  The provision of § 547(c)(2) prevents avoidance of a transfer made in the "ordinary course of business" and specifically

> to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was--

---

[5]   References to page numbers in citations are to numbers that appear in the docketing label on each page rather than to page numbers of the underlying document itself.

[6]   The parties refer to a third report relating to VEC Technology, LLC.  The proceedings involving VEC Technology are not before the Court and so that report will not be evaluated.

(A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or

(B) made according to ordinary business terms;

Before certain amendments to § 547 in 2005, the "or" between the text that is now labeled (A) and (B) in § 547(c)(2) was an "and" and a showing on both conditions had to be made to establish the ordinary course of business defense. *See, e.g.*, *Gulfcoast*, 460 F.3d at 1079. Following the 2005 amendments, a party asserting the defense can prevail by demonstrating either one. *Stevenson v. Turowski & Son Funeral Home, Inc. (In re Nowlen)*, 452 B.R. 619, 621 (Bankr. E.D. Mich. 2011). The transferee bears the burden of establishing the ordinary course of business defense by a preponderance of the evidence. *Gulfcoast*, 460 F.3d at 1079. No precise legal test exists for the ordinary course of business defense and "the court must engage in a peculiarly factual analysis." *Harrah's Tunica Corp. v. Meeks (In re Armstrong)*, 291 F.3d 517, 527 (8th Cir. 2002) (internal quotation marks omitted). Condition (A) has been referred to as a "subjective" prong and condition (B) as an "objective" test. The objective prong "requires the transferee to prove that the business terms are in accordance with industry practice, not simply that they are in accordance with the practice between the debtor and the transferee" and the transferee is required to "produce evidence of an independent, objective standard of the practices of the relevant industry." *Gulfcoast*, 460 F.3d at 1079.

Mr. Schaeffer's expert reports respond to the reports of Defendants' expert, Guy Davis, on their defenses to the Trustee's claims under §§ 547-548. Mr. Davis's report concerning the claims against JMC is the only report submitted in connection with the present motion and so the Court focuses on the two experts' analyses as to JMC for background purposes. In relevant part, the reports address certain transfers from debtor Genmar Holdings to JMC during the one-year period before Genmar Holdings' bankruptcy filing.

5

For the ordinary course of business defense, Mr. Davis's report presents an analysis under the subjective prong of § 547(c)(2).  He used invoices reflecting the payment history between Genmar Holdings and JMC to determine the ordinary payment time range or "grace period" from the invoice date to payment date.  Docket No. 22-1 at 17-19.  He then referenced industry statistics on typical payment ranges from the Risk Management Association (RMA) to "corroborate" the results and contends that they generally support his analysis of the standard range between the parties, i.e. the standard subjective range.  *Id.* at 19.  He then applied the transfers at issue from the preference period to separate out the ones within the standard subjective range and those outside of it to arrive at his conclusion of the amount subject to recovery after accounting for the ordinary course payments.  *Id.* at 20.  He next did a new value assessment to reach his final figures.  *Id.*

Mr. Schaeffer's report presents the analysis under each of the two prongs of § 547(c)(2), i.e. the subjective and objective prongs.  Although the complete reports with exhibits were not submitted, the main report regarding payments from Genmar Holdings to JMC reflects that Mr. Schaeffer did a similar analysis to Mr. Davis's based on the parties' payment history, but using slightly different numbers to arrive at the typical subjective payment period range.  Docket No. 22-4 at 15-17.  Mr. Schaeffer then analyzed the transfers at issue from the preference period to determine the payments that would fall outside the typical range, and in his opinion, therefore would not qualify for an ordinary course of business defense.  *Id.*  That forms the subjective prong analysis in Mr. Schaeffer's report.  *Id.*  The report next uses the RMA figures to set the typical industry payment date range and analyzes the transfers at issue against the industry range to arrive at the amounts that were not in the ordinary course by industry standards.  *Id.*  As to new value, Mr. Schaeffer adopted the position that JMC should not be entitled to any credit

because it "is impossible to calculate the new value to which Defendant may be entitled under the Bankruptcy Code." Docket No. 22-4 at 15. He nonetheless computed the final amount "[i]f the Court determines that the Defendant has adequately proved its new value defense." *Id.* at 10.

So the expert reports differ in that Mr. Davis does not proffer a separate calculation under the objective prong for JMC, even though he did the analysis as a check on his subjective-prong numbers, while Mr. Schaeffer does put forward the objective prong calculation. Both experts, nonetheless, arrive at numbers that are fairly close to each other. The total transfers from Genmar Holdings to JMC for potential § 547 consideration amounted to $3,044,151 for the one-year period prior to filing of the bankruptcy petition. Mr. Davis concludes that after excluding ordinary course payments, the amount for further consideration is $1,612,185 and Mr. Schaeffer concludes it to be $1,626,206 (subjective prong) or $1,541,108 (objective prong). Docket Nos. 22-1 at 20, 22-4 at 10. After the new value analysis, Mr. Davis arrives at an amount of $313,293 and Mr. Schaeffer's amount is $313,307 (both prongs), although he maintains the position that the new value exemption should not be applied. Docket Nos. 22-1 at 20, 22-4 at 10.

Mr. Schaeffer's expert report for Defendant Operation Bass similarly presents his analysis of its § 547 defenses. The report covers transfers to Operation Bass from all five debtors. Docket No. 15-2 at 11-12. For each debtor, Mr. Schaeffer computes the amount that he contends can be avoided by the Trustee under the subjective prong and under the objective prong of § 547(c)(2). *Id.* It also presents the amounts that would be recoverable "[i]f the Court determines that the Defendant has adequately proved its New Value Defense." *Id.*

B. <u>Moving Defendants' Arguments for Exclusion of Mr. Schaeffer's Testimony</u>

The Defendants seek to exclude Mr. Schaeffer's opinions in their entirety. Docket No. 13 at 18-19. They contend that Mr. Schaeffer's opinions are unreliable and make three

arguments for exclusion.  None of them, however, warrant precluding Mr. Schaeffer from testifying.

      *i.*    *Mr. Schaeffer's Use of RMA Data*

Defendants contend that Mr. Schaeffer's reliance on data from RMA's yearly report to determine industry norms on the "payment date range," without any independent validation or additional evidence renders his opinion unreliable.  *Id.* at 10-13.  They note that the RMA characterizes its statistics as providing "general guidelines" and not "absolute industry norms." *See id*; Docket No. 15-7 at 4.  They contend that other courts have found that RMA data is not entitled to much weight.  Docket No. 13 at 11-13.

While Defendants point to certain caveats that RMA included in its publication "The Annual Statement Studies: Financial Ratio Benchmarks, 2009-2010," the same document also claims that RMA is the "most respected source" of industry information and that "[f]or over 88 years, RMA's *Annual Statement Studies*® has been the industry standard for comparison financial data."  Docket No. 15-7 at 3.  As the Trustee notes, experts have used RMA data in other cases and contexts without the mere fact of that use rendering the expert testimony inadmissible.  *See, e.g.*, *Blue Cross & Blue Shield of Minn. v. Wells Fargo Bank, N.A.*, Civ. No. 11-2529, 2013 U.S. Dist. LEXIS 78018, at *10-11, *22-24 (D. Minn. June 4, 2013) (declining to exclude expert testimony that used RMA data); *Barber v. Murphy (In re Patriot Seeds, Inc.)*, No. 03-84217, 2010 Bankr. LEXIS 294, at *61-72 (Bankr. C.D. Ill. Jan. 20, 2010) (considering expert testimony that relied on RMA data, but ultimately finding it insufficient to meet the transferee's burden of making a showing on the objective prong of § 547(c)(2) because it did not correspond to the relevant narrow industry).  Even in the case that Defendants cite in which Mr. Schaeffer's opinion was ultimately excluded by a bankruptcy appellate panel for grounds

inapplicable here, the bankruptcy judge called the RMA "a well-established source for credit information."[7] *Kaye v. Agripool, SRL (In re Murray, Inc.)*, No. 304-13611, 2007 Bankr. LEXIS 4957, at *14-15 (Bankr. M.D. Tenn. Oct. 9, 2007).

Defendants point to several cases that they contend support their position. But none of those cases stand for the proposition that use of RMA data by itself renders an expert opinion inadmissible. Docket No. 13 at 10-13. They only show that certain applications of RMA data may be inappropriate in the context of a case or insufficient to meet a party's burden of proof under the circumstances involved. In *Coleman v. American Concrete, Inc. (In re Sportsman's Link, Inc.)*, No. 07-10454, 2011 Bankr. LEXIS 2588, at *8-15 (Bankr. S.D. Ga. May 24, 2011), the bankruptcy judge primarily criticized an expert's methodology of valuing a debtor's inventory by reducing its balance sheet value to yield the industry norm in turnover ratio, as measured by RMA data. Significantly, the judge did not strike the expert's testimony as requested, but found it was entitled to "little weight" because of the methodology and its failure "to answer the crucial question of how inventory which [the expert] valued at $245,291.00 in December of 2007 sold for $960,105.19 in October of 2008." *Coleman*, 2011 Bankr. LEXIS 2588, at *14-15. In *Lightfoot v. Amelia Maritime Services (In re Sea Bridge Marine, Inc.)*, 412 B.R. 868, 875-76 (Bankr. E.D. La. 2008), the bankruptcy court found the transferee's expert's

---

[7]    In *Agripool*, Mr. Schaeffer submitted an opinion for the defendant transferee and had used RMA data on the industry range for domestic transactions, but the parties involved made the relevant transactions international. *See Murray, Inc. v. Agripool, SRI (In re Murray, Inc.)*, 392 B.R. 288, 299 (B.A.P. 6th Cir. 2008). Mr. Schaeffer made certain adjustments to the RMA numbers to reach a conclusion on the industry range for international transactions. *Id.* While the bankruptcy judge found his approach acceptable, the Sixth Circuit Bankruptcy Appellate Panel found that his adjustments were based on speculation rather than reliable information about international transactions. *Id.* at 300-302. Thus, the opinion did not criticize the reliability of RMA data as a general matter, but rather the particular application of domestic RMA data with speculative adjustments to account for the international character of the transactions at issue. No such concern has been presented here.

analysis of the then-required objective prong of the "ordinary course of business" exception too "one-dimensional" and insufficient "to establish the industry practice with regard to marine fuel supply credit arrangements," because it only focused on the industry receivables collection period.  The court did not find the testimony inadmissible because the expert had reviewed RMA data, but concluded that the defendant had failed to establish an industry benchmark to meet its burden of proof of establishing the ordinary course of business exception.  *Lightfoot*, 412 B.R. at 876.  In *Terry Manufacturing Co. v. Bonifay Manufacturing (In re Terry Manufacturing Co.)*, 332 B.R. 630, 633-34 (M.D. Ala. 2005), the court did not exclude any testimony or criticize reliance on RMA data, but rather accepted statistics from RMA and another source as evidence of the industry payment period range in making a determination that the relevant periods for the debtor and defendant were significantly beyond the normal industry range.

The question therefore is whether Mr. Schaeffer's particular application of the RMA data in the context of the present case renders his opinion on the objective prong of the analysis under § 547(c)(2) so unreliable as to be inadmissible.  The Court does not find that it does.  Defendants' expert used the RMA data as a "sanity check" for his subjective prong analysis.  While Mr. Davis did not use the RMA data in the same way as Mr. Schaeffer, because Mr. Davis did not proffer calculations under the objective prong, Mr. Davis's reference to the data nonetheless confirms that he did not find any issues with it that might render it inappropriate for consideration in the context of this case.  Moreover, the number resulting from Mr. Schaeffer's analysis under the objective prong for JMC does not deviate greatly from the numbers that both experts arrived at under the subjective prong.

The section of the RMA report that Defendants quote in its entirety lists several reasons why the data "*may not be* fully representative of a given industry."  Docket Nos. 13 at 3

(emphasis added), 15-7 at 4-5.  Defendants have not identified any basis for finding that any of the potential issues with RMA data in fact are present in the data set on which Mr. Schaeffer relied to such an extent that renders his opinion unreliable.  While additional sources of information might strengthen or increase the persuasive power of his analysis under the objective prong, the Court does not find that his reliance on RMA data alone, to determine the typical industry payment date range, renders that determination and the resulting calculation "so fundamentally unsupported" such that Mr. Schaeffer's testimony must be excluded.  *See Bonner*, 259 F.3d at 929-30.

ii.   *Standard Deviation Used by Mr. Schaeffer*

Defendants criticize Mr. Schaeffer's use of a standard deviation of 1 in his calculation of the normal payment period range for his calculation under the subjective prong of the ordinary course of business exception of § 547(c)(2).  To calculate the subjective grace period range based on the debtor and transferee's transaction history, both Mr. Schaeffer and Mr. Davis did the following: took certain payment time periods from historical transactions between the parties; found the median time period of days X; and then determined the two numbers that are a particular standard deviation away from X in either direction to arrive at the minimum and maximum values that make up the range.  Mr. Schaeffer used a standard deviation of 1, while Mr. Davis used a standard deviation of 1.5.

Defendants contend that Mr. Schaeffer lacked any legitimate explanation for his choice of a standard deviation of 1.  In his report, Mr. Schaeffer noted that his consulting company has used that deviation in over 400 some cases and it "is generally considered to provide a more accurate assessment of what is the ordinary payment range."  Docket No. 22-4 at 15-16.  At his deposition Mr. Schaeffer confirmed his opinion that it is a conservative and reasonable approach.

Docket No. 15-4 at 12.  In other words, in his professional judgment and based on his experience, he considered a standard deviation of 1 to be appropriate.

Defendants do not point to any basis for finding that determination unreasonable or otherwise unreliable.  Their expert, Mr. Davis, used a standard deviation of 1.5 with a claim that "[i]t is common for statisticians to use 1.5 standard deviations to measure statistically significant departures from the mean."  Docket No. 22-1 at 19.  While the experts disagree on the appropriate standard deviation to use, Mr. Schaeffer's use of a more conservative number does not appear unreasonable.  Defendants do not point to any material that suggests otherwise.

    *iii.*    *Mr. Schaeffer's Evaluation of the Evidence*

With its last criticism, Defendants levy three different complaints against Mr. Schaeffer's proposed testimony.  But none of them amount to anything more than disagreements about the evidence and his evaluation of it.  The first two will be more appropriately handled through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."  *Daubert*, 509 U.S. at 596.  The last one is a non-issue.

Defendants first fault Mr. Schaeffer's analysis of management fees from Genmar Holdings to JMC.  Docket No. 13 at 15-16.  Apparently JMC employees performed various administrative and management tasks for Genmar Holdings and other businesses.  JMC did not charge fees on an hourly or itemized task basis.  Rather, Mr. Schaeffer's report describes testimony that at the end of the year JMC estimated the amount of time employees spent on work for Genmar Holdings and attributed an annual fee to Genmar Holdings.  Docket No. 22-4 at 15.  Mr. Davis treated that fee as payment for "new value" and divided up the annual amount evenly over the relevant time period to determine the value that JMC provided to Genmar Holdings.  Docket No. 22-1 at 20.  Mr. Schaeffer, however, took the position that such treatment incorrectly

assumes that JMC's work for Genmar was distributed evenly over the year.  Docket No. 22-4 at

15.  While Defendants contend that the evidence supports a different conclusion, they have not

shown an unreliability resulting in Mr. Schaeffer's position that warrants excluding his

testimony.

Next, Defendants criticize Mr. Schaeffer's evaluation of certain evidence related to

Defendant Operation Bass.  Docket No. 13 at 16-18.  Defendants question Mr. Schaeffer's

assessment of a "check-swap" between Genmar Holdings and Operation Bass for $1,252,478.52.

According to Mr. Schaeffer's review of the evidence, Operation Bass provided money to

Genmar Holdings for the stated purpose of covering the rent on leased tournament boats and

awards.  Docket No. 15-2 at 12.  Similarly, he found that Genmar Holdings provided money to

Operation Bass for the stated reason of payment of advertising expenses and sponsorship fees.

*Id*.  Defendants point to testimony that the swap was part of an arrangement needed to address

some sales tax laws implicated by a fishing tournament organized by Operation Bass.  Docket

Nos. 13 at 6, 15-4 at 22.   So, according to the Defendants, the payments were for a tax benefit,

which presumably they contend would be new value under the contemporaneous exchange

provision of § 547(c)(1).  Mr. Schaeffer, however, took the position that the stated purposes

show that the payments were "in payment of unrelated debts owed that existed prior to the

respective payments, these payments cannot be part of a contemporaneous exchange defense."

Docket No. 15-2 at 11.  Defendants also disagree with Mr. Schaeffer's evaluation that Operation

Bass's collection efforts from third parties differed from its collection effort from Genmar

Holdings.[8]  These factual disputes are for the jury to resolve and not ones to be decided in the context of a *Daubert* motion.

Finally, Defendants contend that Mr. Schaeffer did not treat the subjective and objective prongs as alternative options for a defendant to establish an ordinary course of business defense as the law allows, but rather assumed that both must be met.  Docket No. 13 at 18.  This argument is unsubstantiated.  Given that it is Defendants' burden to establish a § 547(c)(2) defense, they may choose to proceed under either the subjective or objective prong.  Thus, their expert might only need to address one.  In contrast, Plaintiff would need to be ready to respond to a defense raised under either prong.  Consequently, it was appropriate for Mr. Schaeffer's report to conduct an analysis under both.

Defendants have not presented any arguments that warrant excluding Mr. Schaeffer's testimony for lack of reliability.

**2.  Plaintiff's Motion to Exclude Arthur C. Cobb**

Arthur C. Cobb is a certified public accountant and president of Cobb & Associates, Ltd. Docket No. 20-2 at 55.  He provided an expert report at the request of certain Defendants in connection with their defenses to the Trustee's claims of preferential and fraudulent transfers. Docket Nos. 20-1, 20-2.  The Trustee's motion does not question his qualifications, but seeks to exclude his testimony for lack of reliability.

---

[8]     Defendants also criticize Mr. Schaeffer's mention of Operation Bass's interaction with third parties as irrelevant to the subjective prong of the ordinary course of business analysis.  Mr. Schaeffer's report covers both the subjective and objective prongs and the discussion might have relevance to the objective prong.  To the extent Plaintiff attempts to introduce irrelevant testimony in light of the issues at trial, Defendants may object at that time.

A.   <u>Overview of Mr. Cobb's Proposed Testimony</u>

Arthur C. Cobb provided an expert report on or around October 11, 2012 to rebut the

Trustee's contention that the debtors were insolvent at the time of certain transfers that the

Trustee seeks to avoid.  One of the showings that the Trustee must make to avoid a transfer

under 11 U.S.C. § 547(b) is that the debtor was insolvent at the time of the transfer.  *See* 11

U.S.C. § 547(b)(3); *Clay v. Traders Bank of Kansas City*, 708 F.2d 1347, 1349 (8th Cir. 1983).

Similarly, under 11 U.S.C. § 548 a fraudulent transfer may be avoided under certain scenarios,

one of which includes the requirement that the debtor "was insolvent on the date that [the]

transfer was made or [the] obligation was incurred, or became insolvent as a result of such

transfer or obligation."

Under the Bankruptcy Code's definition, an entity debtor, other than a partnership or

municipality, would be deemed "insolvent" if the sum of its debts is greater than all of its

"property, at a fair valuation, exclusive of--(i) property transferred, concealed, or removed with

intent to hinder, delay, or defraud such entity's creditors; and (ii) property that may be exempted

from property of the estate under section 522 of this title."  11 U.S.C. § 101(32).  In the context

of a going concern, the "fair valuation" represents the "fair market price of the debtor's assets

that could be obtained if sold in a prudent manner within a reasonable period of time to pay the

debtor's debts."  *Lawson v. Ford Motor Co. (In re Roblin Indus.)*, 78 F.3d 30, 35 (2d Cir. 1996).

If, however, the debtor is in such distress that it is no longer viable, the liquidation value of its

assets may more accurately reflect a fair valuation.  *See Beckman v. Von Christierson (In re CSI*

*Enters.)*, 220 B.R. 687, 690 (Bankr. D. Colo. 1998).  A variety of valuation methodologies have

been used to determine fair value of a going concern.  *See Iridium IP LLC v. Motorola, Inc. (In*

*re Iridium Operating LLC)*, 373 B.R. 283, 344 (Bankr. S.D.N.Y. 2007) (identifying the

approaches of "(a) actual sale price, (b) discounted cash flow method, commonly referred to as

DCF, (c) adjusted balance sheet method, (d) market multiple approach, (e) comparable

transactions analysis, and (f) market capitalization").

The Trustee here seeks to avoid various transfers occurring between June 2007 and May

2009, and he contends that the debtors were insolvent during that time period.  Genmar Holdings

filed for bankruptcy on June 1, 2009.  In his expert report, Mr. Cobb summarizes his opinions

that during the period from June 2007 to May 2009, Genmar Holdings was a "going concern"

and its assets exceeded its liabilities such that it was not insolvent.  *See* Docket No. 20-1 at 4-5.

His report also references the financial situation of each of the other Defendants, i.e. the

subsidiaries or related entities to Genmar Holdings.  *See* Docket No. 20-2 at 27-68.

For Genmar Holdings, Mr. Cobb's report presents a primary solvency analysis

incorporating an adjusted balance sheet approach.  Docket No. 20-1 at 49-50 ("We have

analyzed Genmar's reported Balance Sheets and other documents and information to identify

assets and liabilities and to estimate fair valuation" and "have adjusted Genmar's reported

Balance Sheet as of May 30, 2009 … to reflect certain estimates of fair valuation.").  For his

balance sheet analysis, Mr. Cobb started with Genmar Holding's balance sheets created in

accordance with Generally Accepted Accounting Principles ("GAAP").  *See id.* at 52-53.  He

then made upward adjustments for the numbers as of May 30, 2009 in two asset categories: (1)

land, buildings, and operating equipment and (2) trade names, trademarks, and intellectual

property.  *See* Docket No. 20-1 at 53.  He added $21,514,000 to the first category and

$142,611,000 to the second in order to reflect their "fair" rather than "book value."  *Id.*  Under

the Bankruptcy Schedules, Genmar Holding's liabilities exceeded its assets by $68,208,112 as of

June 1, 2009.  Mr. Cobb concluded that his two adjustments to the balance sheet numbers results in Genmar's assets exceeding its liabilities by $95,916,888 as of June 1, 2009.[9]  *Id.*

Mr. Cobb's report also includes a brief section titled "VALUATION" in which he states that Genmar Holding's "[a]ssets at fair value were analyzed by application of the discounted cash flow approach to valuation."  *See* Docket No. 20-2 at 24-26.  The section starts by describing a valuation for the "Boat Group" as of June 30, 2007 conducted by a third party.  *Id.* at 24.  Without any specification of numbers used in the calculations, under a subsection titled "Discounted Cash Flow," the report states that "[r]epresentative estimates of prospective cash flow indicate generation of earnings and indicate equity value (assets exceed liabilities), including in the range of greater than approximately $50,000,000 as of May 30, 2009."  *Id.* at 25. The section goes on to discuss in general terms the reasons to expect amounts that contribute to value to increase and for those that detract from value to decrease for Genmar Holdings.  *Id.* at 25-26.

B.  Trustee's Arguments for Exclusion of Mr. Cobb's Testimony

The Trustee seeks to exclude Mr. Cobb's testimony at trial on *Daubert* grounds.  For purposes of his *Daubert* motion, the Trustee does not fault Mr. Cobb's "going concern" analysis. Rather, the Trustee focuses on and contends that the valuation part of Mr. Cobb's solvency analysis is so unreliable that his opinions must be excluded.  The Trustee contends that Mr. Cobb's solvency analysis of Genmar Holdings and any testimony as to the solvency of its subsidiaries should be excluded.  Mr. Cobb's analysis of Genmar Holdings' assets and liabilities

---

[9]      Although he only analyzed the balance sheet as of May 30, 2009, he notes that generally Genmar's assets decreased and its liabilities increased from June 30, 2006 to June 1, 2009. Docket No. 20-1 at 50.  Thus, he concluded that since Genmar was solvent as of May 30, 2009, it would be expected to have been solvent through that preceding time period.  *Id.*

under each of the two approaches used—adjusted balance sheet and discounted cash flow—will

be evaluated first, followed by a review of his treatment of the subsidiary debtors.

       *i.*   *Adjusted Balance Sheet Analysis for Genmar Holdings*

Under the adjusted balance sheet approach, the debtor's reported balance sheets are used

as a starting point.  *See, e.g.*, *Silverman v. Paul's Landmark, Inc. (In re Nirvana Rest.)*, 337 B.R.

495, 506 (Bankr. S.D.N.Y. 2006).  But balance sheets often only reflect the "book value" of

items and may not cover the appropriate mix of items to capture a fair valuation of the debtor and

so adjustments, additions, and deletions may be necessary.  *See Orix Credit Alliance v. Harvey*

*ex rel. Lamar Haddox Contractor (In re Lamar Haddox Contractor)*, 40 F.3d 118, 121 (5th Cir.

1994) (explaining that "[f]inancial statements reflect the book value of assets, ordinarily the cost

of the property reduced by accumulated depreciation," and fair value "is not determined by

asking how fast or by how much it has been depreciated on the corporate books," but by

estimating the market value of the debtor's assets); *In re Merry-Go-Round Enterprises, Inc. v.*

*The CIT Group/Commercial Serv., Inc.*, 229 B.R. 337, 342-343 (Bankr. D. Md. 1999)

(discussing some of the reasons balance sheets in accordance with GAAP do not correspond to

the fair valuation of a debtor's assets and liabilities as referenced by the language of 11 U.S.C. §

101(32)).

The Trustee argues that Mr. Cobb's balance sheet analysis of Genmar Holdings should be

excluded because Mr. Cobb used a flawed methodology, or in the alternative, because Mr.

Cobb's upward adjustment of two categories of assets was "illogical and unreliable."  *See*

Docket No. 18 at 20-31.  In making his methodology argument, the Trustee contends that Mr.

Cobb's approach fails to meet the valuation standards of the American Institute of Certified

Public Accountants' ("AICPA") for two reasons.  *Id.* at 20-24.  But neither of the arguments

warrants exclusion.

First, the Trustee contends that AICPA requires a valuation professional doing a

valuation to reach a "conclusion of value" or a "calculated value" of the business and Mr. Cobb

did not do so for Genmar Holdings.  Docket No. 18 at 16-17.  In particular, the Trustee notes that

Mr. Cobb did not reach a specific conclusion about the amount by which he believes that

Genmar Holdings' assets exceeded its liabilities, but only concluded that the company's assets

exceeded its liabilities.  But the issue to which Mr. Cobb's testimony relates is that of solvency

in the context of 11 U.S.C. §§ 547-548 and the Trustee does not point to any case or other

authority[10] that requires such an analysis to include a calculation of a specific value by which the

debtor's assets exceed or fall short of its liabilities.  The applicable definition of "insolvent"

requires a showing that, at the relevant time, the sum of the debtor's "debts [was] greater than all

of [the debtor's] property, at a fair valuation" accounting for the designated exclusions.  11

U.S.C. § 101(32).  Mr. Cobb did not compute a specific valuation of Genmar Holdings, but

essentially appears to have taken the position that the "magnitudes of excess" reflected by the

two adjustments he made to the balance sheet numbers render other variations immaterial such

that he could conclude that the company's assets exceeded its liabilities.  Docket No. 20-3 at 6-9.

Mr. Cobb's report does explicitly confirm, on an individual basis, that the "fair value is estimated

to be the reported value" for the other categories of balance sheet assets and liabilities.  *See* 20-1

at 55-59, 20-2 at 1-15.  The report also includes a section titled "Unreported Liabilities," in

which Mr. Cobb discusses certain additional liabilities.  Docket No. 20-2 at 16-19.  While he

---

[10]     While the AICPA Statement on Standards for Valuation Services lists litigation, and
specifically bankruptcy among other types of litigation, as a context in which valuations may
occur, Docket No. 20-7 at 6, it does not indicate that solvency determinations under 11 U.S.C. §
101(32) require a computation of a definitive valuation number.

does not explain why the reported values equal the fair values for the other categories and does not arrive at a determinative number for the unreported liabilities, these failures open him up to challenges on cross-examination, rather than render his opinion inadmissibly unreliable.

Second, the Trustee argues that Mr. Cobb essentially used the "book values" of the assets and liabilities rather than the fair market value, because he only adjusted two asset values. Docket No. 18 at 24-26. But even though Mr. Cobb only made two adjustments, he did consider and conclude that for the other categories, the reported values represent the fair value. Consequently, the Court does not find the methodology flawed, even if his conclusions may be open to valid challenges. *Cf. Premier Entm't Biloxi LLC v. U.S. Bank Nat'l Assoc. (In re Premier Entm't Biloxi LLC)*, 445 B.R. 582, 638-40 (Bankr. S.D. Miss. 2010) (reviewing, with approval, an expert's application of the adjusted balance sheet approach in which two notable adjustments to the GAAP-compliant balance sheet values had been made). To the extent the Trustee contends that other adjustments should have been made or that the amount of the adjustments should have been different, those are issues for cross-examination and presentation of contrary evidence so that the jury can reach its decision on insolvency of Genmar Holdings.

After raising his methodology challenges, the Trustee also contends that Mr. Cobb's particular application of the adjusted balance sheet approach was unreliable. In particular, the Trustee questions the appropriateness of the timing of the appraisals Mr. Cobb used in adjusting the value of the real estate and intellectual property asset categories. *See* Docket No. 18 at 26-31. These challenges relate to the factual bases of Mr. Cobb's opinion and generally such challenges go to the credibility, and not admissibility, of the expert's testimony. *Bonner*, 259 F.3d at 929-30. The Trustee raises some valid criticisms about the factual bases for Mr. Cobb's adjustments, but they will be more appropriately directed to the jury at trial.

ii.    *Discounted Cash Flow Analysis for Genmar Holdings*

The Trustee contends that Mr. Cobb's discounted cash flow analysis cannot be shown to be reliable, because he does not provide any numbers used to reach his determination of an equity value "greater than approximately $50,000,000 as of May 30, 2009" for Genmar Holdings. *See* Docket No. 18 at 15-20. The Trustee also argues that Mr. Cobb references inadequate sources of data for his discounted cash flow analysis. *Id.* A discounted cash flow analysis entails estimating the periodic cash flow that a company will generate over a discrete time period, determining the "terminal value" of the company at the end of the period, and discounting each of the cash flows and terminal value to determine the total value as of the relevant date. *See Bank of Am. v. 203 N. LaSalle St. Pshp.*, 195 B.R. 692, 696 (N.D. Ill. 1996); *Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 316-17 (Bankr. S.D.N.Y. 2013). An appropriate discount rate needs to be used to discount the projected cash flows and terminal value. *See Bank of Am.*, 195 B.R. at 696. An appropriate rate may be the projected weighted average cost of capital for the company. *See In re Mirant Corp.*, 334 B.R. 800, 817 (Bankr. N.D. Tex. 2005).

The Trustee correctly notes that Mr. Cobb's report does not disclose the values that Mr. Cobb used for his discounted cash flow calculation. In particular, the report does not show the projected periodic cash flows, the terminal value, or the discount rate that Mr. Cobb used to reach his conclusion that the value of Genmar Holdings was at least $50 million. At his deposition, Mr. Cobb testified that he made a number of "projections that varied by the top line revenues" and discussed several considerations. *See* Docket No. 20-5 at 5-6 (Cobb Dep., 176-179). He could not recall the discount rate used. *Id.* at 7 (Cobb Dep., 181). Defendants have not pointed to any place where Mr. Cobb actually shows his calculations either during discovery or

in response to the present motion.  Thus the reliability of his calculation cannot be assessed by the Court and has not otherwise been shown by the Defendants.  The lack of information also limits the Trustee's ability to reasonably probe or counter Mr. Cobb's claim in a particularized manner.  The omission cannot be overlooked, especially because Mr. Cobb's discounted cash flow analysis is for Genmar Holdings' value as of May 30, 2009—a point in time when its bankruptcy filing was imminent.  Docket No. 20-5 at 15 (Cobb Dep., 215:5-17).  Therefore, the Court will exclude Mr. Cobb's testimony regarding his discounted cash flow analysis and his resulting determination of a value of at least $50,000,000.  To be specific, Mr. Cobb may not testify to the content of the "valuation" section presented on pages 82 to 84 of the report.  *See* Docket No. 20-2 at 24-26.

iii.     *Solvency Analysis for Subsidiaries*

The Trustee seeks to preclude Mr. Cobb from testifying regarding the solvency of the debtor entities related to Genmar Holdings, arguing that Mr. Cobb did not conduct a solvency analysis of each of them separate from that of the parent company.  Docket No. 18 at 31-33.  At his deposition, Mr. Cobb stated that "as went Genmar Holdings, I believe so go[] the subsidiaries."  Docket No. 20-3 at 6 (Cobb Dep., 18:1-6).  He acknowledges that he only "generally" analyzed the assets-versus-liabilities position of the subsidiaries.  *Id.* at 6-7 (Cobb Dep., 20:5-21:4).  His report lists the subsidiaries' reported numbers for stockholder equity and intercompany balances for 2008 and 2009.  *See* Docket No. 20-2 at 27, 41-51.  At his deposition, he explained that those numbers show that assets exceeded liabilities for the subsidiaries.  *See* Docket No. 20-5 at 8 (Cobb Dep., 186-188).

The statutory language of 11 U.S.C. §§ 547 and 548 implies that the insolvency showing that the Trustee must make for his claims of preferential and fraudulent transfers is with regard to

the particular debtor that made the challenged transfer.  Thus, to the extent the Trustee seeks to

avoid a transfer from a particular subsidiary of Genmar Holdings, it is the solvency of the

subsidiary that is at issue.  *See* 11 U.S.C. §§ 547-548; *Am. Classic Voyages Co. v. JP Morgan*

*Chase Bank (In re Am. Classic Voyages Co.)*, 367 B.R. 500, 503 n.5 (Bankr. D. Del. 2007)

(noting that it is the transferor entity's solvency that is relevant to the preference analysis).

Moreover, a parent company's solvency does not necessarily imply solvency of its subsidiaries.

*Askanase v. Fatjo*, 130 F.3d 657, 669-70 (5th Cir. 1997).

Defendants have not shown that Mr. Cobb conducted a solvency analysis that passes the

*Daubert* check for the individual debtors other than Genmar Holdings.  Mr. Cobb's report

acknowledges that typically balance sheets prepared in conformance with GAAP "do not include

all assets, property, and liabilities, debts, and do not include assets at fair valuation," and only

provide a "starting point."  Docket No. 20-1 at 49.  But for the subsidiaries, the report only

quotes financial statement numbers without analysis reflecting the absence of any need for

further adjustments.  The Defendants have also not pointed to any analysis by Mr. Cobb that

shows that in the context of this case he determined, with verifiable reliability, that the solvency

of the parent company does imply the solvency of any individual subsidiary.  The Court will

therefore preclude him from providing testimony on the solvency question for the individual

debtor entities other than Genmar Holdings.

## CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT

IS ORDERED THAT:

1.  Defendants Irwin L. Jacobs, Jacobs Management Corporation, Jacobs Trading,
    LLC, John Paul DeJoria Family Trust, and Operation Bass, Inc.'s Motion to
    Exclude Expert Testimony of Harold A. Schaeffer, Jr. [Docket No. 11] is
    DENIED.

    2.       Plaintiff's Motion to Exclude Expert Testimony of Arthur H. Cobb [Docket No. 16] is GRANTED in part and DENIED in part.  Mr. Cobb may not testify about the content covered on pages 82-84 of his report in this matter, [Docket Nos. 20-1, 20-2], and may not provide testimony directed at the issue of the solvency of the debtors other than Genmar Holdings, Inc.

Dated:  March 21, 2014

s/Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge
